Allison S. Hyatt (SBN 217567)
allison@medinamckelvey.com
MEDINA McKELVEY LLP
925 Highland Pointe Drive, Suite 300
Roseville, California 95678
Telephone: (916) 960-2211
Facsimile: (916) 742-5488

Attorneys for Plaintiffs
BROCK STRATTON, NICOLE
STRATTON, and C.S., a minor by and
through his guardian ad litem BROCK
STRATTON

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BROCK STRATTON, NICOLE STRATTON, C.S., a minor by and through his guardian ad litem BROCK STRATTON,<br><br>        Plaintiffs,<br><br>v.<br><br>OROVILLE CITY ELEMENTARY SCHOOL DISTRICT, ELIZABETH MGBAM, KIMBERLY TYLER, JOHN BETTENCOURT, SPENCER HOLTOM, and DOES 1-30,<br>        Defendants. | CASE NO.:<br><br>**COMPLAINT FOR DAMAGES AND JURY DEMAND** |

Plaintiffs BROCK STRATTON, NICOLE STRATTON, and C.S., a minor by and through his guardian ad litem BROCK STRATTON (hereinafter "C.S.") (collectively "Plaintiffs"), allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this action on behalf of themselves and as guardian ad litem for their minor child, C.S. C.S. was 5 years old when he was placed in Defendant ELIZABETH MGBAM'S classroom at Oakdale Heights Elementary School in Defendant OROVILLE CITY ELEMENTARY SCHOOL DISTRICT. There, he was subjected to an improper and illegal restraint that left him with physical and emotional damages. The case was referred to the District Attorney's Office.

## JURISDICTION AND VENUE

2.      Jurisdiction over Plaintiffs' federal law claims is founded upon 28 U.S.C. § 1331 [federal question jurisdiction] and 28 U.S.C. § 1343(a)(3) [federal civil rights jurisdiction]. All claims for violation of Plaintiffs' rights under the laws and the constitution of the United States are brought pursuant to 42 U.S.C. § 1983.

## INTRADISTRICT ASSIGNMENT

3.      This case arose in Butte County, California and, pursuant to Rule 120(d) of the Local Rules of the Eastern District of California, shall be commenced in the United States District Court sitting in Sacramento, California.

## PARTIES

4.      Plaintiff BROCK STRATTON is a resident of the City of Oroville, County of Butte, California. He brings this action on his own behalf and as guardian ad litem for his son, C.S.

5.      Plaintiff NICOLE STRATTON is a resident of the City of Oroville, County of Butte, California. She brings this action on her own behalf.

6.      Plaintiff C.S. is a minor and a resident of the City of Oroville, County of Butte, California.

7.      At all times relevant to this complaint, Defendant OROVILLE CITY ELEMENTARY SCHOOL DISTRICT ("OCESD") is/was a public entity operating under



California law as a local educational agency.  All actions by other Defendants were taken under control of state law, in the course and scope of their employment with OCESD with conduct ratified by OCESD.

8.     At all times relevant to this complaint, Defendant ELIZABETH MGBAM ("MGBAM") is/was a special education teacher employed by Defendant OCESD at Oakdale Heights Elementary School.  All actions by MGBAM were taken under control of state law and in the course and scope of her employment with OCESD.  MGBAM is credentialed through the California Teachers Commission.  MGBAM's credentials authorize her to teach students with mild/moderate disabilities as well as children with Autism.

9.     At all times relevant to this Complaint, Defendant KIMBERLY TYLER ("TYLER") is/was a Special Education Director and Principal employed by OCESD.  All actions by TYLER were taken under control of state law and in the course and scope of her employment with OCESD.

10.    At all times relevant to this Complaint, Defendant JOHN BETTENCOURT ("BETTENCOURT") is/was the Principal of Oakdale Heights Elementary School within OCESD.  All actions by BETTENCOURT were taken under control of state law and in the course and scope of his employment with OCESD.

11.    At all times relevant to this Complaint, Defendant SPENCER HOLTOM, ED.D. ("HOLTOM") is/was the superintendent employed by OCESD.  All actions by HOLTOM were taken under control of state law and in the course and scope of his employment with OCESD.

12.    At all times relevant to this Complaint, DOES 1–30, were agents and/or employees of OCESD.  All actions of DOES 1–30 were taken under control of state law and in the course and scope of their agency and/or employment with OCESD.

## FACTUAL ALLEGATIONS

13.    C.S. qualifies for special education services based on a primary qualification of autism and secondary qualification of speech and language impairment.  At the time of the incident, C.S. was a well-behaved, sweet, fun-loving five-year-old little boy that was in his kindergarten year at OCESD.  C.S. is non-verbal but repeats words when he is excited or upset.  C.S. thrives on one-



on-one interaction with people that build a rapport and relationship with him. C.S. loves to play outside, ride his tricycle, jump on the trampoline, and play with his family dog, Missy. He enjoys playing with cars, balls, and toy animals. He also loves to play, solve puzzles and problem solve in general.

14.     In 2019, BROCK and NICOLE STRATTON (collectively "PARENTS") noticed C.S. was showing signs of significant developmental delays and consulted with his doctor. C.S. was referred to the Far Northern Regional Center (the "Reginal Center"), that developed an early intervention plan for C.S. The Regional Center also developed a referral to OCESD on May 1, 2019, as well as the University of California, Davis MIND Institute ("MIND").

15.     On May 17, 2019, OCESD prepared a wholly inadequate assessment plan only in the areas of health, language/speech communication development, and play observation and record review.[1] Therein began a constant battle where Plaintiffs continually requested appropriate assessments and services and OCESD failed and refused to provide appropriate assessments and services.

16.     After C.S. was assessed through MIND, he was diagnosed with Autism Spectrum Disorder ("Autism"). The doctor recommended (1) an intervention program with Applied Behavior Analysis (ABA)-based intervention strategies; (2) Speech Therapy at the maximum level along with a speech-language evaluation; and (3) Occupational Therapy at the maximum level along with an occupational therapy evaluation.

17.     Plaintiffs requested ABA through OCESD. ABA is the leading approach to improving the developmental deficiencies associated with autism. ABA therapy focuses on human behavior and is able to increase desirable behavior and minimize unwanted behaviors. OCESD denied PARENTS' request for ABA services. PARENTS then sought ABA services through the Regional Center. PARENTS discovered Center for Autism and Related Disorders

///

---

[1] C.S., by and through his PARENTS, filed a Due Process Request with the Office of Administrative Hearings on April 6, 2022, to address OCESD's failure to provide C.S. with a free and appropriate public education, as required by both Federal and State law. The programmatic issues themselves are not before this Court.

("CARD") located in Yuba City, California, and went through the process of obtaining ABA services through CARD for C.S. through their health insurance and the Regional Center.

18.     C.S. was assigned a certified ABA provider through CARD in Yuba City, California. First Kristie Eggers and later Marilyn Artinian ("Artinian"), both of whom are Board Certified Behavior Analysts ("BCBA") were assigned as C.S.'s Clinical Supervisors beginning in 2019. As part of C.S.'s education, Artinian supervises behavior technicians, or ABA aides, that work with C.S. directly in the classroom. Artinian prepared behavioral intervention strategies that, similar to OCESD policies and procedures, are recommended to solicit positive behaviors from C.S. CARD provided intervention strategies to OCESD staff to address behavioral challenges, such as noncompliance. However, OCESD staff often refused to implement the recommended strategies.

19.     Nevertheless, for the 2021–2022 school year, C.S.'s Individualized Education Program (hereinafter "IEP") provided one hour of Specialized Academic Instruction (hereinafter "SAI") each day along with weekly speech and language and occupational therapy services. Although the IEP provided for one hour of SAI, OCESD unilaterally made the decision, at some point in time, to place C.S. in SAI, with Defendant MGBAM, for two hours each day. During the two-hour time period, C.S. had an ABA aide for approximately one hour of time along with one hour of unsupervised time in the SAI classroom with Defendant MGBAM so that the ABA aide could take their lunch break.

A.     **THE FEBRUARY 15, 2022 ILLEGAL AND IMPROPER RESTRAINT**

20.     Up until February 15, 2022, C.S. was excited to go to school and was almost always in a good mood. When Plaintiff BROCK STRATTON prepared C.S. for school he always encouraged excitement about school, sticking to a routine that positively influenced C.S. Father asked, "Are you excited to go to school?" or "Are you ready for school?" C.S. replied "School. School." And became physically and emotionally excited.

21.     C.S. remained excited about school up and until February 15, 2022, when he was inappropriately and illegally restrained by his trusted special education teacher, Defendant

///

MGBAM, in a manner that caused immediate redness, bruising, scratching, and severe emotional distress.

22.     On February 15, 2022, at approximately 9:00 a.m., C.S. stood at a station next to his ABA Aide, Paola Mota. Mota held an iPad where she collected and input data about C.S. On this day and at this time, Mota's supervising BCBA, Ms. Artinian, observed C.S. through the iPad. Since the beginning of the school year, all the ABA aides that assisted C.S. used an iPad to collect data and allow for required supervision hours by the BCBA, Ms. Artinian. Indeed, MGBAM and C.S.'s general education teacher communicated with the BCBA throughout the school year, to offer suggestions and advice to solicit positive behavior and enforcements. On occasions, the suggestions were used. On other occasions, the suggestions were ignored.

23.     Leading up to the illegal restraint, C.S. was at a table and was presented with several tasks in his classroom by the teacher's aide. C.S.'s ABA Aide observed the interaction. C.S. was playing with toy animals and did not want to transition to reading a book, as the teacher's aide demanded. C.S. was noncompliant and said "no." The ABA aide suggested the teacher's aide find a book about an animal and allow C.S. to continue to play with the toy animal that the book was about. C.S. complied. After the book, the teacher's aide then wanted to transition C.S. to writing. C.S. was noncompliant and said "no." The teacher's aide again told him to put the toys away. C.S. got upset and started to walk away. The teacher's aide grabbed C.S. and physically pulled C.S. back to the table. C.S. was provided a 2-minute break. The teacher's aide then requested C.S. to put the toys away so that he could perform a writing task. C.S. remained noncompliant. C.S.'s ABA aide suggested an additional 30-second break, with a transition warning, since he remained noncompliant. Instead, the teacher's aide demanded immediate compliance. C.S. then knocked a few toys off the table and said "no." The teacher's aide told C.S. "[i]t is time to work." C.S. said "no" and stomped his feet. The teacher's aide then attempted to remove the toys that C.S. was playing with and toys that were in front of him. C.S. said "no" and in frustration threw the toy in his hand. Unfortunately, the toy hit the teacher's aide in the eye and she then walked away.

24.     At that time, MGBAM walked across the classroom and angrily stated "we don't do that." MGBAM then grabbed C.S. by the arm and dragged him outside to a fully enclosed fenced

- 6 -

area. C.S.'s ABA aide was not consulted nor were any of the recommended implementations and accommodations ever put in place by OCESD to avoid escalating behaviors. C.S.'s ABA aide did, however, follow C.S. out to the gated area and observed the incident, with her supervising BCBA observing the incident through the iPad.

25.     As MGBAM angrily guided C.S. to a bench in the enclosed-gated area, C.S. tried to release MGBAM's arm grip by pulling his arm down and away. C.S. was not a danger to himself or anyone else, let alone <u>imminent danger,</u> a requirement by law if <u>any</u> type of restraint is used. Regardless, MGBAM sat at the edge of the bench and then pulled C.S. around to place him directly in front of her so she could continue to discipline him for throwing the toy. MGBAM grabbed C.S. by both his wrists and held him tightly in front of her, angrily saying, less than one foot from his face, "we don't throw things at people, listen to me, we don't do that. We need to apologize." Scared and having never been restrained before in any manner, C.S. again tried to pull away both of his arms. A video of the incident shows that C.S. was not throwing a tantrum. Instead, he attempted to loosen the teacher's grip and separate from MGBAM. There was nowhere for C.S to go had she released him, since he was in an enclosed gated area with two self-latching gates. Again, there was<u> no danger or harm,</u> other than MGBAM's own actions.

26.     Despite this fact, MGBAM grabbed him harder and continued to get upset with him while her face was only inches from him face. C.S. turned around, again trying to release the grip that made instant red marks and scratches, and later caused bruising. MGBAM then grabbed him around his back and continued to reprimand him. C.S. again tried to release MGBAM's grip. At one point, C.S. slipped to the ground on his buttocks area, forcing himself forward because of the grip and momentum from MGBAM's hold. Rather than release C.S., MGBAM grabbed him even harder, causing C.S. to twist and turn. C.S.'s arm then appeared to hyperextend, and yet, MGBAM continued to grab onto his wrists, never releasing her grip and instead tightening her grip. MGBAM then dragged him up and back into the classroom. Unbelievably, the filmed incident on the bench is approximately 60 seconds. MGBAM brought C.S. back inside to the classroom, with a tight hold on his left wrist.

///



27.     C.S., then crying, immediately went to his ABA aide and stood by her side.  When MGBAM approached him, C.S. hid behind his ABA aide and sobbed tears.  C.S.'s ABA aide transitioned C.S. to a bean bag chair where he curled into a ball.  MGBAM approached C.S. with an emoji with a "guilty face" and stated "[h]e looks guilty.  He is guilty."  MGBAM then asked C.S. how he felt.  C.S. said "no, sad" in tears and put the emoji back in the bin where it belonged.  MGBAM then walked over and offered C.S. playdough.  He took the playdough and remained with his ABA aide in the classroom.  Shortly thereafter, and because C.S. was crying and upset, C.S's ABA aide took C.S. out of the classroom.

28.     At approximately 9:45 a.m. C.S.' ABA aide contacted PARENTS to inform them of the incident.  She then took C.S. to the bathroom, where they remained until Plaintiff BROCK STRATTON arrived.  By the time Plaintiff BROCK STRATTON arrived at the school, C.S. had developed redness and scratches on both his arms.

29.     BROCK STRATTON, who is also mandated to report child abuse based on his occupation, immediately took C.S. to the police station.  C.S. remained completely quiet during the interview, sitting quietly by his father's side.  BROCK STRATTON reported the exact information that the ABA aide stated to him.

30.     That evening, Defendant HOLTOM contacted PARENTS.  HOLTOM stated he called to talk about the "incident" and asked for PARENTS' perception of what "may or may not" have happened.  PARENTS refused to talk.  HOLTOM never discussed any facts related to the incident and did not make any statements.  Nor did he describe the incident.  Simply stated, HOLTOM's conversation fell substantially short of the legally required notification.  Indeed, had the ABA aide not been present, on information and belief, and based on past history as described below, PARENTS likely would not have known about the illegal restraint except for the scratches and bruising that would cause questions since C.S. had scratches and bruises on both of his arms.  PARENTS may have thought the bruises came from the playground, like they did on prior occasions when C.S. came home with bruises.  But on February 15, 2022, it was clear the scratches, bruising and redness was an injury C.S. sustained at the hands of MGBAM.

///

- 8 -



31.     The next day, on February 16, 2021, PARENTS made arrangements to watch the video on February 17, 2022.  Approximately 32 hours after the incident, on February 16, 2022, at approximately 5:12 p.m., OCESD's Special Education Director, Defendant TYLER, finally contacted PARENTS to "discuss" the incident that occurred at approximately 9:15 a.m.  on February 15, 2022.  PARENTS expressed their concern over C.S.'s safety and advised TYLER that they could not return C.S. back to school until they knew he would be safe.  For the first time since C.S. started school, C.S. visibly got upset when PARENTS discussed "school."  Rather than excitement, C.S. stated "No.  No.  School."  During the call, TYLER stated "they take the allegations very seriously."  However, on information and belief and based on witness statements, MGBAM returned to school to teach her class the day after the incident, on February 16, 2022.  It is not even clear whether OCESD ever investigated the incident even though the video shows MGBAM violated the law and school policies.  On information and belief, all OCESD staff, including MGBAM, TYLER, BETTENCOURT, and HOLTOM, failed to file a mandated child abuse report despite the legal requirement to do so, as discussed in more detail below.

32.     Unbelievably, and despite C.S.'s educational record and lack of any identified behavioral issues, during that call, TYLER then offered placement in the severely disabled classroom despite C.S.'s success in his general education class with typically developing peers.  The incident took place in the special education classroom.  Although OCESD staff failed to investigate the incident, the local Sheriff's Office completed an investigation and referred the matter to the District Attorney's Office.

33.     Butte County Sheriff's Office investigated the incident.  After the deputy spoke with BROCK STRATTON, he drove to Oakdale Elementary School to observe the location.  The area directly in front of the classroom, where the most egregious part of the incident occurred, was secured by a security fence that was approximately 6 feet high with security slats.  There were two swinging gates, with hinging latches at the top of each gate.  There was no access outside the gated area without adult supervision.

34.     The deputy spoke with the Director of Special Education and Principal of Sierra Del Oro School, Defendant TYLER.  TYLER represented that "she had been informed of the situation

and was following-up with required protocols." TYLER's statement was false. Protocols were not followed. Staff failed to complete a Suspected Child Abuse Report, required by Penal Code section 11166. No investigation occurred. In fact, MGBAM, on information and belief from a Parent of another student in that class, returned to her classroom the next day.

35. The deputy returned to the Sheriff's Office. As mandated by law, but not followed by any OCESD staff, the deputy completed a Child Services Suspected Child Abuse Report and contacted Butte County Children's Services Department.

36. The deputy made multiple attempts, including calls, emails and personal contact, to speak with MGBAM. When the deputy finally spoke with MGBAM in person, MGBAM stated she spoke to her attorney, who advised her not to speak with law enforcement. MGBAM instead made a statement to BETTENCOURT. Plaintiffs have yet to see the statement.

37. C.S. was unable to return to the same school after the incident. C.S. has attended counseling to work on his emotional trauma and school refusal since the incident. During the first few counseling sessions, C.S. visibly shook every time he saw a picture of a school bus or there was mention of school, which was followed with sleepless nights. The incident continues to severely traumatize C.S., however, C.S. was finally able to return to a different school, within OCESD, at the beginning of the 2022–2023 school year, because of his counseling and parental support.

**B. OCESD STAFF FAILED TO PROPERLY AND TIMELY REPORT THE FEBRUARY 15, 2022 INCIDENT**

38. Law and District Policy obligate OCESD to prepare a Behavior Emergency Report (BER) <u>on the same day of the incident</u>. A "Behavior Emergency" is defined as serious, dangerous behavior that staff has determined to present a clear and present danger to others. It requires a <u>Non-violent</u> Physical Intervention to protect the safety of the student, self, or others. <u>Behavior Emergencies require the BER be completed and submitted to the administrator for administrative action</u>.

39. MGBAM purportedly prepared the BER on February 17, 2022, two days after the incident even though the law requires completion of a BER <u>on the date of the incident</u>. On February

17, 2022, PARENTS made a written request for all of C.S.'s educational records. PARENTS wanted to review information in C.S.'s educational record about the February 15, 2022, incident, including the BER.

40. On February 22, 2022, seven days after the incident, BETTENCOURT produced records and specifically wrote to PARENTS that "I do not have any disciplinary records, behavior records, or emails concerning them. I also do not have a police report." "Behavior Records" would include the BER, if one existed at that time.

41. On March 24, 2022, over one month after the February 22, 2022 communication, an updated written communication was provided to PARENTS that attached a disciplinary note from the February 15, 2022 incident. Also included was the BER that was dated February 17, 2022. It is not clear when the BER or the disciplinary note were actually prepared by OCESD staff. Attached as Exhibit "1" is a true and accurate copy of the BER that MGBAM completed regarding the February 15, 2022 illegal restraint.

42. The BER falsely reports that PARENTS were notified within 24 hours via phone call and provided a copy of the emergency report, that no BIP was in place and that District scheduled an IEP team meeting within two days of the incident. OCESD staff's false statements are indicative of their overall treatment of C.S., his PARENTS, and the February 15, 2022 illegal restraint that physically and mentally harmed an innocent five-year-old boy with autism. The BER also represents that OCESD provided the BER to SELPA on February 23, 2022. On information and belief, the BER was not prepared until February 23, 2022, the same day OCESD sent the required BER to SELPA to report the incident.

43. The BER shows the intervention was made in violation of the law and OCESD policies. MGBAM purportedly completed the BER. In it, MGBAM admitted her reason for physical contact was disciplinary and retaliatory in nature. MGBAM stated she "took him by the wrist and escorted him outside to counsel him. Teacher held student by both wrists while talking to him, he tried to pull away. Teacher also held him close while seated." MGBAM attempted to justify her admittedly illegal behavior because she claimed the teacher's aide requested a toy before he transitioned. C.S. allegedly "refused to hand her the toy and instead he threw the toy very hard

- 11 -

at her face and hit her in the eye." MGBAM also admitted that the video "showed student time outside with teacher for a little over 1 minute. Teacher then led him back inside by his wrist." MGBAM claimed that C.S. apologized to the aide. However, C.S. is nonverbal. MGBAM also claimed to have then worked with him until it was time to leave the classroom. However, the ABA aide took C.S. to the restroom, where he remained emotional when his father, BROCK STRATTON, came and picked him up.

44.     C.S. was in the restroom when BROCK STRATTON arrived at the school. After MGBAM attempted to distract C.S. with playdough, according to his ABA aide, C.S. stayed curled on a bean bag for a short time before his ABA aide took him to the restroom. The ABA aide also contacted C.S.' PARENTS.

45.     Following the incident, Defendant TYLER made comments that "it's not that bad" to downplay the violation and cover up the illegality of the restraint.

46.     In 1976, the Legislature found and declared that the protection against corporal punishment should include children while they are under the control of the public schools. "Children of school age are at the most vulnerable and impressionable period of their lives and it is wholly reasonable that the safeguards to the integrity and sanctity of their bodies should be, at this tender age, at least equal to that afforded to other citizens." Cal. Ed. Code § 49000. "Corporal punishment" means the "willful infliction of, or willfully causing the infliction of, physical pain on a pupil." Cal. Ed. Code § 49001.

47.     The Legislature also found and declared that it is only appropriate to physically intervene in an emergency to prevent a pupil from imminent risk of serious physical self-harm or harm of others, restraint and seclusion are dangerous interventions, with certain known practices posing a great risk to child health and safety. Cal. Ed. Code § 49005(a).

**C.     DISTRICT EMPLOYEES ARE MANDATED REPORTERS UNDER THE CHILD ABUSE REPORTING ACT AND FAILED TO REPORT THE ABUSE**

48.     At the beginning of every school year, OCESD employees must attend training, including training about when to report child abuse, even if the child abuse is suspected. Further, staff are required to initial their understanding of certain requirements. Attached as Exhibit "2" is

- 12 -

a true and accurate copy of a blank "Child Abuse Reporting" document provided to OCESD staff along with the attachments provided in support of that document which include explanations of the law, a blank suspected child abuse report form, board policy and administrative regulation regarding child abuse prevention and reporting, and the penal codes covering this subject.

49.     The first paragraph of Exhibit "2" states: "As a document holder authorized to work with children, it is part of my professional and ethical duty to report <u>every instance</u> of child abuse or neglect <u>known or suspected</u> to have occurred to a child with whom I have professional contact." (Emphasis added.)   Moreover, every staff member initials that failure to report an instance of suspected child abuse is a misdemeanor punishable by up to six months in jail or by a fine of one thousand dollars ($1,000), or both.

50.     The final paragraph acknowledges and certifies that "I will fulfill all the duties required of a mandated reporter.   I have read the above statement and will comply with the applicable reporting requirements."   The original is kept in the employee's personnel file and the employee is given a copy.

51.     OCESD's   Board   Policy,   section   5141.4(a)   is   titled   "CHILD   ABUSE PREVENTION   AND   REPORTING."   In this policy, similar to California law, the Board recognizes that child abuse has severe consequences and OCESD has a responsibility to protect students by facilitating the prompt reporting of known and suspected incidents of child abuse.   The Policy also requires the Superintendent or designee to establish procedures for the identification of reporting of such incidents in accordance with the law.   The Superintendent must provide training regarding the reporting duties of mandated reporters.   If training is not provided, the Superintendent is required to report such information to the California Department of Education.   Cal. Penal Code § 11165.7.

52.     California Penal Code sections 11165.5 and 11165.6, and OCESD's AR section 5141.4(a), defines *child abuse or neglect* to include (1) Willful harming or injuring of a child or the

///

///

///



endangering of the person or health of a child as defined in Penal Code 11165.3[2]; and (2) Unlawful corporal punishment or injury as defined in Penal Code 11165.4[3].

53.    Board Policy also provides that "Training shall also include guidance in the appropriate discipline of students, physical contact with students, and maintenance of ethical relationships with students to avoid actions that may be misinterpreted as child abuse." (*See* Exhibit 2.)

54.    OCESD's Reporting Procedures also <u>require</u> an employee that receives a complaint from a parent to notify the parent/guardian of procedures for filing a complaint with the appropriate agency.    The <u>employee also is obligated</u> pursuant to Penal Code 11166 to <u>file a report</u> himself/herself using the procedures described <u>for mandated reporters</u>.    OCESD AR § 5141.4(e). (*See* Exhibit 2.)

55.    Significant to this Complaint, "Restraint and seclusion should only be used as a safety measure of last resort, and <u>should never be used as punishment or discipline</u> or for staff convenience." Cal. Ed. Code § 49005(c) (emphasis added).    The Legislature also recognized that restraint and seclusion may cause serious injury or <u>long-lasting trauma</u> and death, even when done safely and correctly. Cal. Ed. Code § 49005(d). (Emphasis added).    The Legislature pointed out that pupils with disabilities are disproportionately subject to restraint and seclusion.  Cal. Ed. Code

_____

[2] California Penal Code section 11165.3 states "'willful harming or injuring of a child or the endangering of the person or health of a child,' means a situation in which any person willfully causes or permits any child to suffer, or inflicts thereon, unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of the child to be placed in a situation in which his or her person or health is endangered."

[3] California Penal Code section 11165.4 states "'unlawful corporal punishment or injury' means a situation where any person willfully inflicts upon any child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition.  It does not include an amount of force that is reasonable and necessary for a person employed by or engaged in a public school to quell a disturbance threatening physical injury to person or damage to property, for purposes of self-defense, or to obtain possession of weapons or other dangerous objects within the control of the pupil, as authorized by Section 49001 of the Education Code.  It also does not include the exercise of the degree of physical control authorized by Section 44807 of the Education Code.  It also does not include an injury caused by reasonable and necessary force used by a peace officer acting within the course and scope of his or her employment as a peace officer."

§ 49005(f). "Restraint and seclusion, as described in this article, do not further a child's education." Cal. Ed. Code § 49005(j).

56.     A "Behavioral restraint" includes a "physical restraint," used "as an intervention when a pupil presents an immediate danger to self or to others." Cal. Ed. Code § 49005.1(a) (emphasis added). "'Physical restraint' means a personal restriction that immobilizes or reduces the ability of a pupil to move the pupil's torso, arms, legs, or head freely." Cal. Ed. Code § 49005.1(f)(1). The Legislature, in Education Code section 49005.4 reiterates, "[a]n educational provider may use seclusion or a behavioral restraint only to control behavior that poses a clear and present danger of serious physical harm to the pupil or others that cannot be immediately prevented by a response that is less restrictive." (Emphasis added.)

57.     California Education Code section 49005.8 specifically states "(a) An educational provider shall not do any of the following: (1) Use seclusion or a behavioral restraint for the purpose of coercion, discipline, convenience, or retaliation." (Emphasis added.)

58.     MGBAM, in the BER, admits she restrained C.S. because, according to MGBAM and in an attempt to justify her illegal behavior, she represented that he threw a toy "very hard at [the teacher's aide's] face and hit her in the eye." [4]   MGBAM crossed the room, grabbed his arm, and dragged him outside. In the BER, MGBAM stated "The teacher took him by the wrist and escorted him outside to counsel him." He posed no imminent threat to himself or others. Moreover, MGBAM, who then sat on the bench to pull C.S. around so she could discipline C.S., tightened her grip, which caused red marks and bruises on a five-year-old boy who was in a self-enclosed gated area.

59.     In California Education Code section 49005.8(6)(c), the Legislature again reiterates that an educational provider "shall afford to pupils who are restrained the least restrictive alternative and the maximum freedom of movement, and shall use the least number of restraint points, while ensuring the physical safety of the pupil and others." The only danger that C.S. faced, was the danger of MGBAM's hands, which were illegally and inappropriately restraining C.S. even though

---

[4] This contention is disputed by two independent witnesses. Regardless, by MGBAM's admission, she violated the law and OCESD policy.

COMPLAINT FOR DAMAGES AND JURY DEMAND

he was in an enclosed gated area.  Nothing about what MGBAM did was appropriate or legal.  Nothing TYLER, BETTENCOURT and/or HOLTOM did following the incident was appropriate or legal.

60.     Indeed, OCESD had already settled a Complaint with the Department of Justice because the District used excessive disciplinary actions against students with disabilities.  In fact, OCESD was required to seek additional yearly training than that which was already required by law because the Department of Justice filed a Complaint against OCESD.  This makes the actions of MGBAM, TYLER, BETTENCOURT and HOLTOM even more outrageous and egregious.

**D.     DISTRICT IS UNDER DEPARTMENT OF JUSTICE MONITORING FOR EXCESSIVE PENALTIES AND DISCRIMINATION AGAINST CHILDREN WITH DISABILITIES**

61.     On August 25, 2020, The People of the State of California, ex. Rel. Xavier Becerra, Attorney General of The State of California, filed a Complaint for Injunctive Relief against Oroville City Elementary School District, Case No. 20CV01681 in the Superior Court of the State of California, County of Butte (hereinafter "AG Complaint").

62.     As the AG Complaint states, the right to education is a fundamental right, and students have the right to equal protection with respect to its provision. *Serrano v. Priest*, 5 Cal.3d. 584, 608–09, 616–17 (1971).  The Attorney General has authority to bring claims against a school district for violation of the California Constitution, Article 1, section 7, or where the district has failed to ensure that all students, regardless of race, color, national origin, ethnicity, or disability, are treated equally in all aspects of education.  Cal. Ed. Code, §§ 220, 262.3, & 262.4.

63.     Also pointed out in the AG Complaint, the Attorney General has the authority to bring claims against a school district for violation of Government Code section 11135, where the district is unlawfully denying students full and equal access to the benefits of, or unlawfully subjecting students to discrimination under its programs and activities on the basis of, inter alia, race color ancestry, national origin, ethnic group identification, mental disability, physical disability, or medical condition. Cal. Gov. Code, § 11135(a).  With respect to discrimination based on disability, the OCESD is subject to the protections and prohibitions contained in state law.  Cal. Gov. Code, § 11135(b).



64.     According to the AG Complaint, in May 2019, the Attorney General's Office began an investigation to determine whether OCESD's policies, procedures, and practices with respect to discipline violated any California laws, specifically those laws protecting students from discrimination based on a protected characteristic and other laws that provide for a state constitutional right to education, other means of correction prior to school removal, and due process protections for students.

65.     OCESD's publicly stated education goals include creating a safe school climate and culture and reducing the significant suspension gap for students of color and students with disabilities.

66.     The AG Complaint also alleged, based on its investigation, that not all OCESD staff are effectively trained on disciplinary policies and procedures or on alternative positive behavioral strategies set forth in state law. Further, OCESD data showed that students with disabilities were substantially more likely to be reported for a discipline incident and at a greater risk of being suspended out of school than similarly situated students without disabilities. Elementary students with disabilities were nearly twice as likely to be reported for threatening or causing injury as similarly situated elementary school students without a disability.

67.     Further, the AG Complaint stated that OCESD's policies, practices, and processes for providing equal access to necessary services for students with disabilities and ensuring that students with disabilities are not denied equal access to education were inadequate.

68.     As a result of the investigation and findings, the AG Complaint alleged causes of action against OCESD, including: (1) Violation of Education Code section 200, *et seq.* and 33315; (2) Violation of California Constitution, Article 1, section 7; (3) Suspensions in Violation of Education Code section 48900, *et seq.*; and (4) Abrogation of the Rights of Students with Disabilities in Violation of Government Code section 11135 and Education Code sections 220 and 48911.

69.     On or shortly after July 28, 2020, the AG Complaint resulted in a Stipulation for Entry of Final Judgment wherein OCESD agreed to an injunction that required: (1) an Education Monitor; (2) Policies, Procedures, Practices and Training; (3) Harassment and Discrimination



Complaints, including revised policies and procedures, a schedule for ongoing training and assemblies for students and staff regarding prohibitions on harassment and bullying, and a trusted staff person to serve as a designated support person at each school-site; (4) Policies, procedures, and practices for students with disabilities, including an annual training plan on such topics as manifestation determination meetings, Positive Behavior Intervention Plan creation and implementation, and effective delivery and implementation of specialized instruction and reasonable accommodations, as well as a plan with District and site-level special education leadership, in addition to two school-site special education liaison positions dedicated to provide support, training and assistance to parents of students with disabilities; and (5) translation of documents, interpretation services and document accessibility.

70. On information and belief, and based on the facts alleged within this Complaint, OCESD is falling substantially short of meeting its obligations under the Stipulation for Entry of Final Judgment.

71. The Department of Justice staff met with NICOLE STRATTON following the February 15, 2022 illegal restraint. On information and belief, the Department of Justice is ordering additional training relating to students with Autism as well as the illegal use of restraints.

**E. MGBAM, TYLER, BETTENCOURT AND HOLTOM'S FAILURE TO INVESTIGATE, FAILURE TO REPORT THE CHILD ABUSE, FAILURE TO FOLLOW LEGAL REQUIREMENTS, AND ATTEMPT TO MITIGATE AND MINIMIZE THE ILLEGAL RESTRAINT IS EVEN MORE OUTRAGEOUS BECAUSE MGBAM HAD AT LEAST ONE COMPLAINT OF CHILD ABUSE AGAINST HER IN THE 2020–2021 SCHOOL YEAR THAT WAS NOT PROPERLY INVESTIGATED**

72. Despite the Stipulation and Order, as well as the additional training, OCESD and BETTENCOURT ignored allegations of child abuse against Defendant MGBAM even before the incident with C.S.

73. Following the illegal use of restraint against C.S., another parent contacted NICOLE STRATTON. The Parent told NICOLE STRATTON that her student, John Doe ("J.D.") is in C.S.'s class. J.D. was also in MGBAM's class in the 2020–2021 school year and also is entitled to special education services. In April 2021, J.D. told his mother that MGBAM pushed and kicked him when nobody was present. J.D. explained to his mother that he tried to tell BETTENCOURT,

but BETTENCOURT told J.D. they would talk later. J.D.'s mother contacted BETTENCOURT, wherein BETTENCOURT represented that he would investigate the incident. BETTENCOURT convinced J.D.'s mother that MGBAM would not do that and that kids at J.D.'s age fabricate stories.

74. This 2021–2022 school year, J.D. told his mother that MGBAM does not like C.S. and that she yells at him. C.S. had an independent ABA aide with him for only one hour of the two hours he was placed in MGBAM's class. This is because the ABA aide eats lunch while C.S. receives specialized academic instruction. On information and belief, when C.S.' ABA aide is not in the classroom, MGBAM treats C.S. poorly, ignores him, and/or yells at him.

75. Based on all of the above allegations, and the failure of all staff at the school and OCESD staff, including MGBAM, MGBAM's teacher's aide, BETTENCOURT, TYLER and HOLTOM, Plaintiffs BROCK AND NICOLE STRATTON, experience daily emotional stress, wondering if C.S. is safe. In addition, C.S. stopped sleeping through the night following the February 15, 2022 incident. The family began counseling and therapy sessions so they could begin to overcome the illegal restraint and the fallout from the illegal restraint.

76. As previously stated, Plaintiffs filed a Due Process Request ("DPR") on or about April 6, 2022, with the Office of Administrative Hearings. In that DPR, C.S., by and through his PARENTS, identified numerous violations of Federal and State laws that require a Free and Appropriate Public Education (FAPE). Following the filing of the DPR, PARENTS agreed to return C.S. to OCESD at a different school, Ophir Elementary School. A critical component of C.S.'s IEP is that he continue to have his independent BCBA, CARD, provide behavioral support services to C.S.

77. Although OCESD agreed to allow the BCBA support, OCESD demanded a substantial change in how the BCBA services were provided. Unbelievably, OCESD staff decided to prohibit the use of CARD's iPad. Since the beginning of the school year, CARD provided an ABA aide in the classroom, that collected data on a CARD iPad. The use of the iPad also allowed the BCBA to provide support and recommendations to the ABA aide based on the data collected so that C.S.'s support plan could constantly change based on the data collected through the iPad.

Further, C.S.'s assigned BCBA sometimes monitored C.S. and the ABA aide, a legal requirement of the BCBA. Only C.S., MGBAM, and MGBAM's aide were visible. The BCBA monitored the illegal restraint on February 15, 2022. In fact, both the BCBA and the ABA aide informed the deputy that MGBAM's restraint was inappropriate and excessive.

78.     When OCESD staff learned that C.S. would attempt to return to school, TYLER informed CARD staff that C.S.'s ABA aide could no longer use a CARD iPad to collect data or allow the BCBA to observe per legal requirements. TYLER never discussed the matter with PARENTS even though PARENTS had previously been privy to all communications between TYLER and CARD staff. It was CARD staff that informed PARENTS that CARD could no longer use the iPad. Unbelievably, OCESD staff represented that they were not aware that the certified BCBA observed the BCBA aide in the classroom.

79.     The BCBA has conversed, through the iPad, with both MGBAM and MGBAM's teacher's aide, as well as C.S.'s general education teacher. OCESD staff's contention, that OCESD staff did not know the BCBA viewed C.S., is inaccurate and untruthful. In addition, PARENTS' insurance will not pay for paper data collection.

80.     For all of these reasons above, on information and belief, the facts will show systemic discrimination against students with disabilities. OCESD staff, including TYLER, BETTENCOURT, and HOLTOM continue to conspire to minimize the illegal restraint and hide previous complaints against MGBAM. For these reasons, punitive damages against TYLER, BETTENCOURT, and HOLTOM, should be awarded to Plaintiffs.

81.     On May 11, 2022, Plaintiffs served Defendants with notice of their intent to file this Complaint, including Government Tort Claims against Defendants and gave them an opportunity to respond. Defendants failed to respond, and again dismissed the severity and illegality of the incident that caused severe trauma to all Plaintiffs. On information and belief, however, MGBAM completed the 2021–2022 school year but no longer works for OCESD.

///

///

///



**FIRST CLAIM FOR RELIEF**
**(Violation of Constitutional Rights, 42 U.S.C. § 1983)**
**Plaintiffs against Defendants MGBAM, TYLER, BETTENCOURT and HOLTOM**

82.     Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 81 inclusive, as if they were fully set forth herein.

83.     Defendant MGBAM violated minor Plaintiff C.S.'s rights under the Fourth Amendment to the United States Constitution by actions, including, but not limited to utilizing unjustified and unreasonable force against and restraining C.S.

84.     Defendants TYLER, BETTENCOURT and HOLTOM violated minor Plaintiff C.S.'s rights under the Fourth Amendment to the United States Constitution by actions, including, but not limited to acting with deliberate indifference to the risk of harm to C.S. from MGBAM. Defendants TYLER, BETTENCOURT and HOLTOM personally participated in the deprivation of minor C.S.'s constitutional rights by their failure to act in response to allegations of child abuse.

85.     Defendants MGBAM, TYLER, BETTENCOURT and HOLTOM violated minor Plaintiff C.S.'s rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by actions, including but not limited to, depriving Plaintiff of equal protection under the law on the basis of disability.

86.     Defendants MGBAM, TYLER, BETTENCOURT and HOLTOM violated Plaintiff's rights under the Due Process Clause to the Fourteenth Amendment to the United States Constitution by actions, including, but not limited to:

a.      Intentionally interfering with the parent-child relationship by concealing information regarding the physical and emotional trauma inflicted on C.S. by MGBAM.  The negative impact has been severe, interference is ongoing and is likely to last many years.

b.      Intentionally interfering with Plaintiffs' right to provide and receive nurture, support, and comfort regarding a highly traumatic event.

87.     As a proximate result of the violations alleged in paragraphs 1 through 84, Plaintiffs have suffered damages as heretofore alleged.

///

## SECOND CLAIM FOR RELIEF
### (Discrimination in Violation of the Americans With Disabilities Act)
### Plaintiffs against Defendant OCESD

88.     Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 87 inclusive, as if they were fully set forth herein.

89.     C.S. is entitled to the protections of the "Public Services" provision of Title II of the Americans With Disabilities Act of 1990, which provides protections to disabled persons. Title II, Subpart A prohibits discrimination by any "public entity," including any state or local government, as defined by 42 U.S.C. § 12131, Section 201 of the ADA.

90.     Pursuant to 42 U.S.C. § 12132, Section 202 of Title II, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity. C.S. was at all times relevant herein a qualified individual with a disability as therein defined.

91.     OCESD has failed in its responsibilities under Title II to provide services, programs and activities in a full and equal manner to disabled persons as described hereinabove, including failing to ensure that educational services are provided on an equal basis to children with disabilities and free of hostility toward their disability.

92.     OCESD has further failed in its responsibilities under Title II to provide its services, programs and activities in a full and equal manner to disabled persons as described hereinabove by subjecting C.S. to a hostile educational environment. MGBAM's actions were motivated by an obvious animus toward the disabled minor C.S. and retaliatory and disciplinary in nature.

93.     Defendants TYLER, BETTENCOURT and HOLTOM were deliberately indifferent to the complaint of abuse committed by MGBAM. They were aware of the abuse yet failed to report it, as required by law and OCESD policy and training. Defendants TYLER, BETTENCOURT and HOLTOM failed to act upon the information. This deliberate indifference by the employees gives rise to respondeat superior liability of OCESD.

94.     As a result of OCUSD's failure to comply with its duty under Title II, C.S. has suffered damages including special and general damages according to proof.



95.     As a result of OCESD's failure to comply with its duty under Title II, Plaintiffs BROCK STRATTON and NICOLE STRATTON have suffered their own independent damages including special and general damages according to proof.

### THIRD CLAIM FOR RELIEF
#### (Violation of § 504 of the Rehabilitation Act of 1973)
#### Plaintiffs against Defendant OCESD

96.     Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 95 inclusive, as if they were fully set forth herein.

97.     Plaintiffs are informed and believe and therefore allege that OCESD is and has been at all relevant times the recipient of federal financial assistance, and that part of that financial assistance has been used to fund the operations, construction and/or maintenance of the specific public facilities described herein and the activities that take place therein.

98.     By their actions or inactions in denying equal access to educational services and by subjecting C.S. to a hostile educational environment, Defendant OCESD has violated C.S.'s rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.

99.     As a result of OCESD's failure to comply with its duty under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder, C.S. BROCK STRATTON and NICOLE STRATTON have all suffered distinct damages including special and general damages according to proof.

### FOURTH CLAIM FOR RELIEF
#### (Battery)
#### C.S. against Defendant MGBAM

100.     Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 99 inclusive, as if they were fully set forth herein.

101.     The use of force, as alleged herein, by Defendant MGBAM against C.S. constituted battery.

102.     As a proximate result of Defendant MGBAM's illegal battery, C.S. suffered damages as alleged heretofore.

///

## FIFTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)
### All Plaintiffs against All Defendants

103.     Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 102 inclusive, as if they were fully set forth herein.

104.     The actions of Defendants as alleged herein were outrageous, malicious, and intended to and did inflict emotional distress and humiliation upon Plaintiffs.

105.     Defendants each had a duty to inform the PARENTS and file a complaint of child abuse after learning about the abuse, and it was foreseeable that withholding the information and conspiring to cover up the information from Plaintiffs would cause more emotional distress than informing them and properly reporting the child abuse.

106.     Defendants' conduct was intentional and outrageous, in that after learning of the abuse, Defendants continued to conspire to withhold information and did not investigate the matter, let alone properly report the matter, as required by law.  OCESD is vicariously liable for the acts of its employees.

107.     As a proximate result of Defendants' intentional acts, Plaintiffs have incurred damages as alleged heretofore.

## SIXTH CLAIM FOR RELIEF
### (Negligence)
### All Plaintiffs against All Defendants

108.     Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 107 inclusive, as if they were fully set forth herein.

109.     Defendants owed Plaintiffs a duty to exercise reasonable care in their interactions with them.  These Defendants failed to exercise reasonable care in their actions as alleged herein.

110.     As a proximate result of Defendants' negligent acts, Plaintiffs have incurred damages as alleged heretofore.

## SEVENTH CLAIM FOR RELIEF
### (Negligent Supervision)
### All Plaintiffs against All Defendants

111.     Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 110 inclusive, as if they were fully set forth herein.

- 24 -



112.     School personnel Defendants owe students under their supervision a protective duty of ordinary care, for breach of which OCESD is vicariously liable.

113.     School principals and other supervisory employees, to the extent their duties include overseeing the educational environment and the performance of teachers and counselors, owe a duty of care to take reasonable measures to guard students against harassment and abuse from foreseeable sources, including any teachers they know or have reason to know are prone to such abuse.   Defendants BETTENCOURT, TYLER, and HOLTOM were aware of MGBAM's propensity to abuse students.

114.     As a proximate result of Defendants' negligent supervision of MGBAM, Plaintiffs have incurred damages as alleged heretofore.

**EIGHTH CLAIM FOR RELIEF**
**(Violation of Mandatory Duty)**
**C.S. against All Defendants**

115.     Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 114 inclusive, as if they were fully set forth herein.

116.     Teachers, instructional aides, classified personnel, and administrative officers of OCESD are mandatory reporters as defined by Penal Code § 11165.7.  As such, they are under a mandatory duty to report to an agency specified in section 11165.9 whenever, in their professional capacity or within the scope of their employment, have knowledge of or observes a child whom the mandated reporter knows, or reasonably suspects has been the victim of child abuse or neglect. Penal Code § 11166.  A mandatory reporter is required to report suspected child abuse immediately or as soon as practicably possible by telephone and the mandated reporter shall prepare and send, fax, or electronically transmit a written follow-up report thereof within 36 hours of the suspicion. *Ibid*.

117.     Teachers, instructional aides, classified personnel and/or administrative officers of OCESD were aware that C.S. in MGBAM's classroom was a victim of abuse as defined by Penal Code §§ 11165.3 and 11165.4.  However, none of these mandatory reporters employed by OCESD complied with their duty to report the abuse to an agency specified in Penal Code § 11165.9.

///

1  PARENTS would most likely not even know of the abuse had it not been for C.S.'s independent

2  ABA Aide.

3       118.   As a proximate result of Defendants' negligent acts, C.S. has incurred damages as

4  alleged heretofore.

**NINTH CLAIM FOR RELIEF**
**(Discrimination in Violation of Government Code Section 11135)**
**All Plaintiffs against Defendant OCESD**

7       119.   Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through

8  118 inclusive, as if they were fully set forth herein.

9       120.   C.S. is entitled to the protections of the "Public Services" provision California

10  Government Code section 11135, *et seq*., which provides protections to disabled persons.

11  California prohibits discrimination by any "public entity," including any state or local government,

12  which includes local educational agencies such as OCESD.

13       121.   Pursuant to California Government Code section 11135, no qualified individual with

14  a disability shall, by reason of such disability, be unlawfully denied full and equal access to the

15  benefits of, or be unlawfully subjected to discrimination under, any program or activity that is

16  conducted, operated or administered by the state or by any state agency. C.S. was at all times

17  relevant herein a qualified individual with a disability as therein defined.

18       122.   OCESD failed in its responsibilities under California Government Code section

19  11135 to provide programs and activities in a full and equal manner to disabled persons as described

20  hereinabove, including failing to ensure that educational services are provided on an equal basis to

21  children with disabilities and free of hostility toward their disability.

22       123.   OCESD has further failed in its responsibilities to provide its services, programs and

23  activities in a full and equal manner to disabled persons as described hereinabove by subjecting

24  C.S. to a hostile educational environment. MGBAM's actions were motivated by an obvious

25  animus toward the disabled minor C.S. and retaliatory and disciplinary in nature.

26       124.   Defendants TYLER, BETTENCOURT and HOLTOM were deliberately indifferent

27  to the complaint of abuse committed by MGBAM. They were aware of the abuse yet failed to

28  report it, as required by law and OCESD policy and training. Defendants TYLER,

- 26 -



BETTENCOURT and HOLTOM failed to act upon the information. This deliberate indifference by the employees gives rise to respondeat superior liability of OCESD.

125. As a result of OCESD's failure to comply with its duty under California Government Code section 11135, Plaintiffs have suffered damages including special and general damages according to proof.

**TENTH CLAIM FOR RELIEF**
**(Violation of Education Code § 220)**
**Plaintiffs against OCESD**

126. Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 125 inclusive, as if they were fully set forth herein.

127. Section 220 of the Education Code provides: "[n]o person shall be subjected to discrimination on the basis of disability . . . in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance or enrolls pupils who receive state student financial aid."

128. A plaintiff may maintain an action for monetary damages against a school district when the plaintiff alleges that they suffered severe, pervasive conduct that effectively deprived the plaintiff of the right of equal access to educational benefits and opportunities; the school had actual knowledge of the conduct; and the school responded with deliberate indifference. *See, e.g. Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 603–09.

129. MGBAM subjected C.S. to severe and pervasive verbal and physical abuse.

130. MGBAM's conduct denied C.S. of the right to equal access to the educational benefits and opportunities (C.S. refused to go to school, OCESD staff refused to allow him back to school without additional conditions, and C.S. as now regressed developmentally while in MGBAM's classroom).

131. OCESD had actual knowledge of MGBAM's complaints of abuse, but was deliberately indifferent when it took no action to prevent the abuse. OCESD was also deliberately indifferent when it took no action following the abuse to C.S.

132. As a proximate result of Defendants' acts, Plaintiffs have incurred damages as alleged heretofore.

COMPLAINT FOR DAMAGES AND JURY DEMAND



**JURY DEMAND**

Plaintiffs hereby demand that this matter be tried by a jury.

**PRAYER**

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

1.      For compensatory damages.

2.      For incidental damages, in an amount according to proof.

3.      For general and special damages, in an amount according to proof.

4.      For punitive and/or exemplary damages, in an amount according to proof.

5.      For attorneys' fees as provided for by the Civil Rights Attorneys Fees Act and other applicable statutes.

6.      For costs of suit.

7.      For any other and further relief as the Court deems just and proper.


Dated:  May 19, 2023                                        MEDINA McKELVEY LLP


                                                            By:  /s/ Allison S. Hyatt
                                                            ALLISON S. HYATT
                                                            Attorneys for Plaintiffs
                                                            BROCK STRATTON, NICOLE
                                                            STRATTON, and C.S., a minor by and
                                                            through his guardian ad litem BROCK
                                                            STRATTON

