Allison S. Hyatt (SBN 217567)
allison@medinamckelvey.com
Daniel S. Chrystal (SBN 352409)
dan@medinamckelvey.com
MEDINA McKELVEY LLP
925 Highland Pointe Drive, Suite 300
Roseville, California 95678
Telephone: (916) 960-2211
Facsimile: (916) 742-5488

Counsel for Plaintiffs
BROCK STRATTON, NICOLE STRATTON, and C.S., a minor by and through his guardian ad litem BROCK STRATTON

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BROCK STRATTON, NICOLE STRATTON, C.S., a minor by and through his guardian ad litem BROCK STRATTON,<br><br>Plaintiffs,<br>v.<br><br>OROVILLE CITY ELEMENTARY SCHOOL DISTRICT, ELIZABETH MGBAM, KIMBERLY TYLER, JOHN BETTENCOURT, SPENCER HOLTOM, and DOES 1-30,<br>Defendants. | CASE NO.: 2:23-cv-00964-TLN-CSK<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND**<br><br>Action Filed: May 19, 2023 |



Plaintiffs BROCK STRATTON, NICOLE STRATTON, and C.S., a minor by and through his guardian ad litem BROCK STRATTON (hereinafter "C.S.") (collectively "Plaintiffs"), allege as follows:

**PARTIES**

1. Plaintiff BROCK STRATTON is a resident of the City of Oroville, County of Butte, California. He is the father of C.S. He brings this action on his own behalf and as guardian ad litem for his son, C.S.

2. Plaintiff NICOLE STRATTON is a resident of the City of Oroville, County of Butte, California. She is the mother of C.S. She brings this action on her own behalf. Plaintiffs Brock and Nicole Stratton will be collectively referred to as ("Parents").

3. Plaintiff C.S. is a minor and a resident of the City of Oroville, County of Butte, California.

4. At all times relevant to this complaint, Defendant OROVILLE CITY ELEMENTARY SCHOOL DISTRICT ("OCESD") is/was a public entity operating under California law as a local educational agency. All actions by other Defendants were taken under control of state law, in the course and scope of their employment with OCESD with conduct ratified by OCESD.

5. At all times relevant to this complaint, Defendant ELIZABETH MGBAM ("Mgbam") is/was a special education teacher employed by Defendant OCESD at Oakdale Heights Elementary School. All actions by Mgbam were taken under control of state law and in the course and scope of her employment with OCESD. Mgbam is credentialed through the California Teachers Commission. Mgbam's credentials authorize her to teach students with mild/moderate disabilities as well as children with Autism.

6. At all times relevant to this Complaint, Defendant KIMBERLY TYLER ("Tyler") is/was a Special Education Director and Principal employed by OCESD. All actions by TYLER were taken under control of state law and in the course and scope of her employment with OCESD.

///

///



7. At all times relevant to this Complaint, Defendant JOHN BETTENCOURT ("Bettencourt") is/was the Principal of Oakdale Heights Elementary School within OCESD. All actions by Bettencourt were taken under control of state law and in the course and scope of his employment with OCESD.

8. At all times relevant to this Complaint, Defendant SPENCER HOLTOM, ED.D. ("Holtom") is/was the superintendent employed by OCESD. All actions by Holtom were taken under control of state law and in the course and scope of his employment with OCESD.

9. At all times relevant to this Complaint, DOES 1–30, were agents and/or employees of OCESD. All actions of DOES 1–30 were taken under control of state law and in the course and scope of their agency and/or employment with OCESD.

## JURISDICTION AND VENUE

10. Jurisdiction over Plaintiffs' federal law claims is founded upon 28 U.S.C. § 1331 [federal question jurisdiction] and 28 U.S.C. § 1343(a)(3) [federal civil rights jurisdiction]. All claims for violation of Plaintiffs' rights under the laws and the constitution of the United States are brought pursuant to 42 U.S.C. § 1983.

## INTRADISTRICT ASSIGNMENT

11. This case arose in Butte County, California and, pursuant to Rule 120(d) of the Local Rules of the Eastern District of California, shall be commenced in the United States District Court sitting in Sacramento, California.

## INTRODUCTION

12. Plaintiffs bring this action on behalf of themselves and as guardian ad litem for their minor child, C.S. C.S. was a 5-year-old kindergarten student at Oakdale Heights Elementary School in Defendant OCED during the 2021-2022 school year. C.S. has been diagnosed with Autism Spectrum Disorder ("ASD"), and is a qualified individual with a disability. As a student with ASD, C.S. sometimes uses maladaptive behaviors to communicate. During the timeframe relevant to this complaint, C.S. had an in-depth Behavior Intervention Plan (BIP) in place to address maladaptive behaviors, which were manifestations of his disability. The specific target behaviors listed in C.S.'s initial BIP in place during the 2021-2022 school year were "tantrum" and



"noncompliance." The additional behaviors associated with these target behaviors included: grabbing for desired items, yelling, hitting, throwing objects, falling to the ground, and/or running from the room.

13. C.S.'s BIP detailed specific target behavior response accommodations to be implemented by staff interacting with C.S. These behavior response accommodations were necessary for C.S. to enjoy meaningful access to his educational environment. In addition to implementing positive behavior responses, C.S.'s behavior accommodations required school staff to "act as though the behavior did not occur." The behavior accommodations listed in C.S.'s BIP go on to specify than when a maladaptive behavior occurs and "some reaction is absolutely necessary, avoid eye contact and give the minimum reaction necessary to keep people and property safe."

14. This action arises from an incident wherein C.S.'s special education teacher at the time, Defendant Mgbam, failed to implement C.S.'s known behavior response accommodations according to his BIP when C.S. exhibited target behaviors. Instead of following C.S.'s behavior accommodations, Mgbam verbally addressed the behavior in the classroom by reprimanding C.S., even though he was being assisted at the time by his ABA trained 1:1 behavior aide who was in the process of responding to the behavior according to his BIP. Mgbam then walked over to C.S. and applied physical force to remove C.S. from the classroom. Once outside the classroom, Mgbam used further physical force to restrain C.S. for approximately one minute while she sat on a bench at eye level with C.S. scolding him for exhibiting a target maladaptive behavior and holding his wrists down at his side tight enough to cause immediate bruising and redness.

15. To an untrained eye, Mgbam's action might seem like a reasonable effort to discipline a kindergarten student and teach him a lesson, but Mgbam's actions in this instance are akin to scolding a student in a wheelchair for not entering an inaccessible area on campus. Rather than provide necessary accommodations in response to C.S.'s behaviors, Mgbam subjected C.S. to unreasonable force given his age, disability, and the lack of any safety reason to use physical force of any kind. As a result, C.S.'s rights were violated under the Fourth Amendment of the United States Constitution, 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act ("ADA") of

1990, § 202, 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act of 1973, § 504 ("Section 504"), 29 U.S.C. § 794; and, related California state law.[1]

16. OCESD and the individual defendant administrators breached their duties to C.S. and Parents by failing to adequately supervise and train Mgbam.

## FACTUAL ALLEGATIONS

17. C.S. qualifies for special education services based on a primary qualification of autism and secondary qualification of speech and language impairment. At the time of the incident, C.S. was, in general, a well-behaved, sweet, fun-loving five-year-old little boy that was in his kindergarten year at OCESD. C.S. is non-verbal but repeats words when he is excited or upset. C.S. thrives on one-on-one interaction with people that build a rapport and relationship with him. C.S. loves to play outside, ride his tricycle, jump on the trampoline, and play with his family dog, Missy. He enjoys playing with cars, balls, and toy animals. He also loves to play, solve puzzles and problem solve in general.

18. Parents discovered Center for Autism and Related Disorders ("CARD") located in Yuba City, California, and went through the process of obtaining ABA services through CARD for C.S. through their health insurance and the Regional Center.

19. C.S. was assigned a certified ABA provider through CARD. First Kristie Eggers and later Marilyn Artinian ("Artinian"), both of whom are Board Certified Behavior Analysts ("BCBA") were assigned as C.S.'s Clinical Supervisors beginning in 2019. As part of C.S.'s educational supports at the time, Artinian supervised behavior technicians, or ABA aides, that worked with C.S. directly in the classroom. CARD developed the BIP for C.S. outlining behavior intervention strategies/behavior response accommodations that were necessary to solicit positive behaviors from C.S. and allow him to enjoy meaningful access to his educational environment by being able to transition to different activities throughout his day, complete nonpreferred tasks, and interact with peers and staff without exhibiting noncompliance and/or tantrum target behaviors.

---

[1] C.S., by and through his PARENTS, filed a Due Process Request with the Office of Administrative Hearings on April 6, 2022, to address OCESD's failure to provide C.S. with a free and appropriate public education, as required by both Federal and State law. The programmatic issues themselves are not before this Court.

- 5 -



20. For the 2021–2022 school year, C.S.'s Individualized Education Program (hereinafter "IEP") provided one hour of Specialized Academic Instruction (hereinafter "SAI") each day along with weekly speech and language and occupational therapy services. Although the IEP provided for one hour of SAI, OCESD unilaterally made the decision, at some point in time, to place C.S. in SAI, with Mgbam, for two hours each day. During the two-hour time period, C.S. had an ABA aide for approximately one hour of time along with one hour of unsupervised time in the SAI classroom with Mgbam so that the ABA aide could take their lunch break.

**A.     The February 15, 2022 Excessive Force Restraint Incident**

21. Up until February 15, 2022, C.S. was excited to go to school and was almost always in a good mood. When Plaintiff Brock Stratton prepared C.S. for school he always encouraged excitement about school, sticking to a routine that positively influenced C.S. Mr. Stratton would ask, "Are you excited to go to school?" or "Are you ready for school?" C.S. would reply excitedly, "School! School!"

22. C.S. remained excited about school up and until February 15, 2022, when he was inappropriately restrained and refused necessary behavior accommodations by his trusted special education teacher, Defendant Mgbam, in a manner that caused severe emotional distress and immediate redness, bruising, scratches to appear on his wrists.

23. On February 15, 2022, at approximately 9:00 a.m., C.S. stood at a station in Mgbam's classroom next to his ABA Aide, Paola Mota. Mota held an iPad where she collected and input data about C.S. On this day and at this time, Mota's supervising BCBA, Ms. Artinian, observed C.S. through the iPad. Since the beginning of the school year, all the ABA aides that assisted C.S. used an iPad to collect data and allow for required supervision hours by the BCBA, Ms. Artinian. Indeed, school staff occasionally communicated with the BCBA throughout the school year, to offer suggestions and receive advice regarding C.S.'s BIP and how to implement necessary behavior accommodations with him.

24. Leading up to the restraint incident, C.S. was at a table and was presented with several tasks by a classroom teacher's aide. C.S.'s ABA Aide observed the interaction. C.S. was playing with toy animals and did not want to transition to the non-preferred task of reading a book,




as the teacher's aide demanded. C.S. was noncompliant and said "no." The ABA aide suggested the teacher's aide find a book about an animal and allow C.S. to continue to play with the toy animal that the book was about. Use of this type of behavior accommodation was listed in his C.S.'s BIP as a form of "Task Modification" to address noncompliance behaviors wherein staff are to "alter tasks so the topic, setting, or way in which they are presented is more preferred by [C.S.]". The accommodation is also a form of "Environmental Enrichment" specified in C.S.'s BIP that calls for staff to "[p]rovide free access to highly preferred stimuli while [C.S.] is engaged in the non-preferred task that usually evokes the target behavior." Using the accommodation of allowing C.S. access to a toy animal while he engaged in the reading task resulted in C.S.'s compliance. He was able to access his curriculum and educational setting through use of the behavior accommodation. After the book, the teacher's aide then wanted to transition C.S. to non-preferred task of writing. C.S. was again noncompliant and said "no." The teacher's aide again told him to put the toys away. C.S. started to walk away. Instead of implementing a Task Modification, Environmental Enrichment or a "Choice" accommodation where the opportunity for C.S. to make choices is maximized, especially during demanding situations, the teacher's aide denied C.S. an accommodation and instead grabbed C.S. and physically pulled him back to the table. C.S. was provided a 2-minute break. The teacher's aide then requested that C.S. put the toys away so that he could perform a writing task. C.S. remained noncompliant. C.S.'s ABA aide suggested an additional 30-second break, with a transition warning, since he remained noncompliant. Instead, the teacher's aide demanded immediate compliance without any accommodation. C.S. then knocked a few toys off the table and said "no." The teacher's aide told C.S. "[i]t is time to work." C.S. said "no" and stomped his feet. The teacher's aide then attempted to remove the toys that C.S. was playing with and toys that were in front of him, rather than offering an Environmental Enrichment, Task Modification, or Choice accommodations. C.S. again said "no" and in frustration threw the toy in his hand. Unfortunately, the toy hit the teacher's aide in the eye and she then walked away.

25. At that time, Mgbam walked across the classroom and in an angry tone, as observed by C.S.'s ABA aide, stated "we don't do that." Mgbam then grabbed C.S. by the arm and forced

- 7 -
FIRST AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND
CASE NO.: 2:23-cv-00964-TLN-CSK

him to walk with her outside the classroom into a fully enclosed fenced area. C.S.'s ABA aide was not consulted nor were any of his behavior accommodations put in place by OCESD staff to avoid escalating behaviors. C.S.'s ABA aide did, however, follow C.S. out to the gated area and observed the incident, with her supervising BCBA observing the incident through the iPad.

26. Mgbam used physical force to cause C.S. to walk with her outside against his will while she held his wrist. The walk outside was fully observed by C.S.'s ABA aide. During the walk, C.S. tried to release Mgbam's grip on his wrist by pulling away. It appeared to the ABA aide that Mgbam increased the force of her grip on C.S.'s wrist even tighter in order to prevent C.S. from escaping her grasp.

27. Mgbam then led C.S. over to a bench in the enclosed-gated area. Mgbam sat down on the bench and forced C.S. to stand in front of her less than a foot from her face at eye level. Mgbam grabbed ahold of C.S.'s other wrist and held both of his arms down by his side restraining his movement while she reprimanded him for exhibiting the target maladaptive behaviors. C.S. was not a danger to himself or anyone else, let alone <u>imminent danger,</u> a requirement by law if <u>any</u> type of restraint is used. Regardless, Mgbam sat at the edge of the bench restraining C.S. by forcibly holding his arms down by his side, keeping a tight grip on both of his wrists. Mgbam continued to reprimand C.S. for his noncompliance/tantrum behaviors that resulted in C.S. throwing the toy by saying in an angry tone: "We don't throw things at people, listen to me, we don't do that. We need to apologize." Scared and having never been restrained before in any manner, C.S. again tried to pull away both of his arms.

28. A video of the incident shows that C.S. was not a danger to himself or anyone else during the incident. He was in a gated playground space and could not have escaped supervision. The video does show Mgbam failing to follow C.S.'s behavior response accommodations and directly violating the specific instruction in C.S.'s BIP that says, "DO NOT physically restrain [C.S.]."

29. C.S. again attempted to loosen the Mgbam's grip and separate from her. There was nowhere for C.S to go had she released him, since he was in an enclosed gated area with two self-latching gates. Again, there was <u>no danger or harm</u>, other than Mgbam's own actions.

30. Despite this fact, Mgbam appeared to again increase the force of her grip around C.S.'s wrists according to the aide's observations and continued to reprimand C.S. while her face was only inches from him face. C.S. turned around, again trying to release Mgbam's grip that made instant red marks and scratches, and later caused bruising. Mgbam then grabbed C.S. around his back and continued to reprimand him. C.S. again tried to release Mgbam's grip. At one point, C.S. slipped to the ground on his buttocks area, forcing himself forward because of the grip and momentum from Mgbam's hold. Rather than release C.S., Mgbam grabbed him even harder, causing C.S. to twist and turn. C.S.'s arm then appeared to hyperextend, and yet, Mgbam continued to hold onto his wrists, never releasing her grip and instead tightening her grip. Mgbam then used physical force to pull C.S. up off the ground and drag him back into the classroom while continuing to hold his wrist. The entire incident lasted close to 2 minutes. Mgbam brought C.S. back inside to the classroom, with a tight hold on his left wrist.

31. C.S., then crying, immediately went to his ABA aide and stood by her side. When Mgbam approached him, C.S. hid behind his ABA aide and sobbed tears. C.S.'s ABA aide transitioned C.S. to a bean bag chair where he curled into a ball. Mgbam approached C.S. with an emoji with a "guilty face" and stated "[h]e looks guilty. He is guilty." Mgbam then asked C.S. how he felt. C.S. said "no, sad" in tears and put the emoji back in the bin where it belonged. Mgbam then walked over and offered C.S. playdough. He took the playdough and remained with his ABA aide in the classroom. Shortly thereafter, and because C.S. was crying and upset, C.S.'s ABA aide took C.S. out of the classroom.

32. At approximately 9:45 a.m. C.S.'s ABA aide contacted Parents to inform them of the incident. She then took C.S. to the bathroom, where they remained until Brock Stratton arrived. By the time Mr. Stratton arrived at the school, C.S. had developed redness and scratches on both his arms.

33. Brock Stratton, who is also mandated to report child abuse based on his occupation, immediately took C.S. to the police station. C.S. remained completely quiet during the interview, sitting quietly by his father's side. Mr. Stratton reported the exact information that the ABA aide stated to him.

34. That evening, Defendant Holtom contacted Parents. Holtom stated he called to talk about the "incident" and asked for Parents' perception of what "may or may not" have happened. Parents declined to relay what the ABA Aide had told them. Holtom never discussed any facts related to the incident and did not make any statements. Nor did he describe the incident. Simply stated, Holtom's conversation fell substantially short of the legally required notification that C.S. had been restrained at school. Indeed, had the ABA aide not been present Parents likely would not have known about the illegal restraint except for the scratches and bruising that would cause questions since C.S. had scratches and bruises on both of his arms. Parents may have thought the bruises came from the playground, like they did on prior occasions when C.S. came home with bruises. But on February 15, 2022, it was clear the scratches, bruising and redness was an injury C.S. sustained at the hands of Mgbam.

35. The next day, on February 16, 2022, PARENTS made arrangements to watch the video on February 17, 2022. Approximately 32 hours after the incident, on February 16, 2022, at approximately 5:12 p.m., OCESD's Special Education Director, Defendant Tyler, finally contacted Parents to "discuss" the incident that occurred at on February 15, 2022. Parents expressed their concern over C.S.'s safety and advised Tyler that they could not return C.S. back to school until they knew he would be safe. For the first time since C.S. started school, C.S. became visibly upset when Parents discussed "school." Rather than excitement, C.S. stated "No. No. School."

36. C.S. was unable to return to the same school after the incident. C.S. has attended counseling to work on his emotional trauma and school refusal since the incident. During the first few counseling sessions, C.S. visibly shook every time he saw a picture of a school bus or there was mention of school, which was followed with sleepless nights. The incident continues to severely traumatize C.S., however, C.S. was finally able to return to a different school, within OCESD, at the beginning of the 2022–2023 school year, because of his counseling and parental support.

**B.  MgBam's Actions Violated the California Education Code.**

37. The California Legislature has declared that it is only appropriate in a school setting to physically intervene in an emergency to prevent a student from <u>imminent risk of serious physical</u>

self-harm or harm of others, restraint and seclusion are dangerous interventions, with certain known practices posing a great risk to child health and safety. Cal. Ed. Code § 49005(a).

38. Significant to this Complaint, "Restraint and seclusion should only be used as a safety measure of last resort, and should never be used as punishment or discipline or for staff convenience." Cal. Ed. Code § 49005(c) (emphasis added). The Legislature also recognized that restraint and seclusion may cause serious injury or long-lasting trauma, even when done safely and correctly. Cal. Ed. Code § 49005(d). (Emphasis added). The California Legislature pointed out that pupils with disabilities are disproportionately subject to restraint and seclusion. Cal. Ed. Code § 49005(f). "Restraint and seclusion, as described in this article, do not further a child's education." Cal. Ed. Code § 49005(j).

39. A "Behavioral restraint" includes a "physical restraint," used "as an intervention when a pupil presents an immediate danger to self or to others." Cal. Ed. Code § 49005.1(a) (emphasis added). "'Physical restraint' means a personal restriction that immobilizes or reduces the ability of a pupil to move the pupil's torso, arms, legs, or head freely." Cal. Ed. Code § 49005.1(f)(1). The Legislature, in Education Code section 49005.4 reiterates, "[a]n educational provider may use seclusion or a behavioral restraint only to control behavior that poses a clear and present danger of serious physical harm to the pupil or others that cannot be immediately prevented by a response that is less restrictive." (Emphasis added.)

40. California Education Code section 49005.8 specifically states "(a) An educational provider shall not do any of the following: (1) Use seclusion or a behavioral restraint for the purpose of coercion, discipline, convenience, or retaliation." (Emphasis added.)

41. The only danger that C.S. faced during the February 15, 2022 Excessive Force Restraint Incident was the danger of MGBAM's hands, which were illegally and inappropriately restraining C.S. even though he was in an enclosed gated area.

**C.   OCED Was on Notice that its Staff Had a History of Failing to Implement Appropriate Behavior Support Accommodations with its Students with Disabilities.**

42. Indeed, OCESD had already settled a complaint with the Department of Justice because the District used excessive disciplinary actions against students with disabilities in 2020.

In fact, OCESD was required to seek additional yearly training beyond that which was already required by law as a result of the complaint. The complaint alleges, based on the Department of Justice investigation, that not all OCESD staff were effectively trained on disciplinary policies and procedures or on alternative positive behavioral strategies set forth in state law. Further, OCESD data showed that students with disabilities were substantially more likely to be reported for a discipline incident than similarly situated students without disabilities. Elementary students with disabilities were nearly twice as likely to be reported for threatening or causing injury as similarly situated elementary school students without a disability.

43. The DOJ complaint stated that OCESD's policies, practices, and processes for providing equal access to necessary services for students with disabilities and ensuring that students with disabilities are not denied equal access to education were inadequate. On or shortly after July 28, 2020, the AG Complaint resulted in a Stipulation for Entry of Final Judgment wherein OCESD agreed to an injunction that required, among other things, that OCED implement policies, procedures, and practices for students with disabilities, including an annual training plan on such topics as Positive Behavior Intervention Plan creation and implementation, and effective delivery and implementation of specialized instruction and reasonable accommodations, as well as a plan with District and site-level special education leadership, in addition to two school-site special education liaison positions, dedicated to provide support, training and assistance to parents of students with disabilities.

44. Additionally, just a week before the February 15, 2022 Incident, an IEP meeting was held to discuss a recent assessment that had been conducted to evaluate C.S.'s executive functioning needs. During that IEP meeting, Mgbam indicated she did not agree with certain ways C.S.'s behavior accommodations were being implemented by his ABA Aide. Defendant Tyler was present during the meeting. MgBam's statements should have been a red flag to Tyler indicating a need to immediately investigate MgBam's statements and her willingness to provide the necessary behavior accommodations listed in the BIP developed by his BCBA through CARD. Tyler later confirmed her ratification of MgBam's conduct by claiming "it wasn't that bad."

///



45. Based on all of the above allegations, Brock and Nicole Stratton experience daily emotional stress, wondering if C.S. is safe. In addition, C.S. stopped sleeping through the night following the February 15, 2022 incident. The family began counseling and therapy sessions so they could begin to overcome the improper restraint incident and the fallout from the improper restraint incident.

46. As previously stated, Plaintiffs filed a Due Process Request ("DPR") on or about April 6, 2022, with the Office of Administrative Hearings. In that DPR, C.S., by and through his PARENTS, identified numerous violations of Federal and State laws that require a Free and Appropriate Public Education (FAPE). Following the filing of the DPR, PARENTS agreed to return C.S. to OCESD at a different school, Ophir Elementary School. A critical component of C.S.'s IEP is that C.S. continues to have independent BCBA support through CARD to provide 1:1 behavioral support services.

47. On May 11, 2022, Plaintiffs served Defendants with their Notice of Tort Claim under the California Tort Claims Act and gave them an opportunity to respond. Defendants failed to respond, and again dismissed the severity and illegality of the incident that caused severe trauma to all Plaintiffs.

**FIRST CLAIM FOR RELIEF**
**(Violation of Constitutional Rights, 42 U.S.C. § 1983)**
**C.S. against Defendants MGBAM, TYLER and OCED**

48. Plaintiffs incorporate and reallege by reference the foregoing paragraphs, as if they were fully set forth herein.

49. "The Fourth Amendment protects students from unreasonable searches and seizures in the school environment." Preschooler II v. Cark County Sch. Bd. Of Trs., 479 F.3d 1175, 1178 (9th Cir. 2007). "Even minor uses of force may be unreasonable where the circumstances do not warrant the use of any force." C.B. v. Sonora Sch. Dist., No. 1:09-CV-00285-OWW, 2011 WL 532404, at *8 (E.D. Cal. Feb. 11, 2011). Reasonableness is a fact-intensive examination that should be considered "in the light of the child's age and disability and the context of the events." Preschooler II, 479 F.3d at 1178.

///



50. Defendant MGBAM violated minor Plaintiff C.S.'s rights under the Fourth Amendment to the United States Constitution by actions, including, but not limited to utilizing physical force against C.S. that was unreasonable under the circumstances given C.S.'s age, disability status, the BIP in place for C.S., and the facts surrounding the February 15, 2022 incident as alleged above.

51. Defendant Tyler and OCED are vicariously liable for Mgbam's use of excessive force by failing to properly train her regarding the use of physical restraint with students and ratifying her conduct after the February 15, 2022 incident.

52. As a proximate result of the violations alleged herein. Plaintiffs have suffered damages as heretofore alleged.

**SECOND CLAIM FOR RELIEF**
**(Discrimination in Violation of the Americans With Disabilities Act)**
**C.S. against Defendant OCESD**

53. Plaintiffs incorporate and reallege by reference the foregoing paragraphs as if they were fully set forth herein.

54. C.S. is entitled to the protections of the "Public Services" provision of Title II of the Americans With Disabilities Act of 1990, which provides protections to disabled persons. Title II, Subpart A prohibits discrimination by any "public entity," including any state or local government, as defined by 42 U.S.C. § 12131, Section 201 of the ADA.

55. Pursuant to 42 U.S.C. § 12132, Section 202 of Title II, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity. C.S. was at all times relevant herein a qualified individual with a disability as therein defined.

56. OCESD has failed in its responsibilities under Title II to provide C.S. with reasonable accommodations in the form of behavior support accommodations that he needed to enjoy meaningful access to the benefits of the public education services provided by OCESD.

///

///

57. OCED was aware of C.S.'s need for reasonable behavior support accommodations and was deliberately indifferent to the fact that these accommodations were not provided to C.S. so that he could enjoy meaningful access to his curriculum and educational setting.

58. As a result OCESD has failed in its responsibilities under Title II to provide its services, programs and activities in a full and equal manner to disabled persons as described herein.

59. As a result of OCUSD's failure to comply with its duty under Title II, C.S. has suffered damages including special and general damages according to proof.

**THIRD CLAIM FOR RELIEF**
**(Violation of § 504 of the Rehabilitation Act of 1973)**
**C.S. against Defendant OCESD**

60. Plaintiffs incorporate and reallege by reference the foregoing paragraphs as if they were fully set forth herein.

61. Plaintiffs are informed and believe and therefore allege that OCESD is and has been at all relevant times the recipient of federal financial assistance, and that part of that financial assistance has been used to fund the operations, construction and/or maintenance of the specific public facilities described herein and the activities that take place therein.

62. Section 504 provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, but denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

63. An organization receiving federal funds "violates § 504 if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services." Mark S. v. Hamamoto, 620 F.3d 1090, 1097 (9th Cir. 2010).

64. By failing to provide C.S. with reasonable accommodations he needed to enjoy meaningful access to the educational services provided by Defendant OCED, C.S.'s rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder, have been violated.

///

**FOURTH CLAIM FOR RELIEF**
**(Battery)**
**C.S. against Defendant MGBAM**

65. Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 99 inclusive, as if they were fully set forth herein.

66. The use of force, as alleged herein, by Defendant MGBAM against C.S. constituted battery.

67. As a proximate result of Defendant MGBAM's illegal battery, C.S. suffered damages as alleged herein.

**FIFTH CLAIM FOR RELIEF**
**(Negligence)**
**All Plaintiffs against All Defendants**

68. Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 107 inclusive, as if they were fully set forth herein.

69. Defendants owed Plaintiffs a duty to exercise reasonable care in their interactions with them. These Defendants failed to exercise reasonable care in their actions as alleged herein.

70. As a proximate result of Defendants' negligent acts, Plaintiffs have incurred damages as alleged heretofore.

**SIXTH CLAIM FOR RELIEF**
**(Negligent Supervision)**
**All Plaintiffs against All Defendants**

71. Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 110 inclusive, as if they were fully set forth herein.

72. School personnel Defendants owe students under their supervision a protective duty of ordinary care, for breach of which OCESD is vicariously liable.

73. School principals and other supervisory employees, to the extent their duties include overseeing the educational environment and the performance of teachers and counselors, owe a duty of care to take reasonable measures to guard students against harassment and abuse from foreseeable sources, including any teachers they know or have reason to know are prone to such abuse. Defendants BETTENCOURT, TYLER, and HOLTOM were aware of MGBAM's propensity to abuse students.



74. As a proximate result of Defendants' negligent supervision of MGBAM, Plaintiffs have incurred damages as alleged heretofore.

**SEVENTH CLAIM FOR RELIEF**
**(Discrimination in Violation of Government Code Section 11135)**
**All Plaintiffs against Defendant OCESD**

75. Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 118 inclusive, as if they were fully set forth herein.

76. C.S. is entitled to the protections of the "Public Services" provision California Government Code section 11135, et seq., which provides protections to disabled persons. California prohibits discrimination by any "public entity," including any state or local government, which includes local educational agencies such as OCESD.

77. Pursuant to California Government Code section 11135, no qualified individual with a disability shall, by reason of such disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated or administered by the state or by any state agency. C.S. was at all times relevant herein a qualified individual with a disability as therein defined.

78. OCESD failed in its responsibilities under California Government Code section 11135 to provide programs and activities in a full and equal manner to disabled persons as described hereinabove, including failing to ensure that educational services are provided on an equal basis to children with disabilities.

79. OCESD has further failed in its responsibilities to provide its services, programs and activities in a full and equal manner to disabled persons by failing to provide C.S. with the reasonable accommodation he needed to enjoy meaningful access to is educational services.

80. As a result of OCESD's failure to comply with its duty under California Government Code section 11135, Plaintiffs have suffered damages including special and general damages according to proof.

**JURY DEMAND**

Plaintiffs hereby demand that this matter be tried by a jury.

///



**PRAYER**

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

1. For compensatory damages.

2. For incidental damages, in an amount according to proof.

3. For general and special damages, in an amount according to proof.

4. For punitive and/or exemplary damages, in an amount according to proof.

5. For attorneys' fees as provided for by the Civil Rights Attorneys Fees Act and other applicable statutes.

6. For costs of suit.

7. For any other and further relief as the Court deems just and proper.


Dated: June 14, 2024                    MEDINA McKELVEY LLP


By: /s/ *Allison S. Hyatt*
    ALLISON S. HYATT
    DANIEL S. CHRYSTAL
    Attorneys for Plaintiffs
    BROCK STRATTON, NICOLE STRATTON, and C.S., a minor by and through his guardian ad litem BROCK STRATTON

